CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAY 14 2020

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| CONNIE J.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:18-cv-00059 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:   Joel C. Hoppe |
| SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Connie J. asks this Court to review the Commissioner of Social Security's final

decision partially denying her applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the

"Act"), 42 U.S.C. §§ 401–434, 1381–1383f. Connie challenges the Commissioner's

determination that, although she was "disabled" for a closed period from December 10, 2014,

through March 28, 2016, Connie's condition medically improved to the point that she was not

disabled after March 29, 2016. *See* Pl.'s Br. 1, 4–9, ECF No. 14. The case is before me by

referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the administrative

record, the parties' filings, and the applicable law, I find that the Commissioner's decision is

supported by substantial evidence and should be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[2] Social Security ALJs follow a five-step process to determine in the first instance whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

The fact that a person was determined to be "disabled" under the Act does not give rise to the presumption that he or she remains disabled. 42 U.S.C. § 423(f). A person's disability "ends" when he or she is again "able to engage in substantial gainful activity." *Id.* § 423(f)(1)(B). This becomes an issue when an ALJ determines that the person was disabled for a "closed period" or when the Commissioner periodically conducts a continuing disability review to determine whether a person who is receiving disability benefits is still entitled to those payments. *See Frans v. Saul*, No. 8:18cv2477, 2019 WL 3938080, at *8 n.7 (D.S.C. Aug. 1, 2019), *adopted by* 2019 WL 3934920 (D.S.C. Aug. 20, 2019); SSR 02-1p, 2002 WL 34686281, at *3 n.2 (Sept. 12, 2002). In either scenario, the Commissioner bears the burden to "show that a medical improvement has occurred, and that the improvement relates to the claimant's ability to work."

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

*Edwards v. Astrue*, 4:12cv5, 2012 WL 6082898, at *3 (W.D. Va. Dec. 6, 2012) (Kiser, J.) (citing *Lively v. Bowen*, 858 F.2d 177, 181 n.2 (4th Cir. 1988)). "Medical improvement" means "any decrease in the medical severity" of an "impairment(s) [that] was present at the time of the most recent favorable medical decision that [the person was] disabled or continued to be disabled." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). Medical improvement relates to the person's ability to work "if there has been a decrease in the severity" of an impairment "and an increase in [the person's] functional capacity to do basic work activities." *Id.* §§ 404.1594(b)(3), 416.994(b)(1)(iii).

## II. Procedural History

In January 2015, Connie filed for DIB and SSI alleging that she was disabled from back and leg problems, cirrhosis, colon cancer, diabetes, chronic obstructive pulmonary disease ("COPD"), asthma, obesity, and thrombocytopenia. *See* Administrative Record ("R.") 73–74, 89–90, 224–35. Connie was forty-four years old, or a "younger person" under the regulations, when she allegedly became disabled on December 10, 2014. R. 73, 89; 20 C.F.R. §§ 404.1563(c), 416.963(c). Disability Determination Services ("DDS"), the state agency, denied her claims initially in October 2015, R. 71–103, and upon reconsideration that December, R. 104–37. In July 2017, Connie appeared with counsel and testified at an administrative hearing before ALJ H. Munday. R. 52–62. A vocational expert ("VE") also testified at this hearing. R. 62–68.

On November 1, 2017, ALJ Munday issued a partially favorable decision concluding that Connie "was 'disabled' within the meaning of the . . . Act from December 10, 2014 through March 28, 2016." R. 20; *see* R. 19–37. On March 29, however, Connie experienced "medical improvement that [was] related to the ability to work" and she could "perform substantial gainful

activity from that date" through November 1, 2017. R. 20. Thus, Connie was entitled to disability

benefits for a "closed period" ending March 29, 2016, but not for the rest of the relevant period.

*Id.* ("[T]he claimant's disability ended on March 29, 2016.").

Connie "had the following severe impairments" throughout the relevant period:

"malignant neoplasm of the colon, obesity, spine disorder, dysfunction of a major joint

(neuropathy), and diabetes mellitus." R. 23; *see* R. 31. Connie had also been diagnosed with

cirrhosis, COPD, gastroesophageal reflux disease ("GERD"), and anxiety, but ALJ Munday

found "no evidence in the record that these impairments cause[d] more than minimal limitations"

in Connie's ability to perform basic work activities. R. 24; *see* R. 24–25. Thus, ALJ Munday

considered those medically determinable impairments to be "nonsevere" throughout the relevant

time. R. 24; *see* R. 31. She also found that Connie's alleged depression, which Connie mentioned

at the administrative hearing in July 2017, was not a medically determinable impairment because

there was no evidence Connie had been formally diagnosed with that disorder. R. 25. Connie's

severe impairments did not meet or equal any relevant Listing either during the closed period, R.

25 (citing 20 C.F.R. pt. 404, subpt. P. app. 1 §§ 1.02, 1.04, 11.14, 13.18), or after March 28,

2016, R. 32 (same).

ALJ Munday then evaluated Connie's residual functional capacity ("RFC") based on all

her medical impairments. *See* R. 26–30, 32–35. From December 10, 2014, through March 28,

2016, Connie retained the RFC to do "light work"[3] except she could "frequently" balance, stoop,

kneel, crouch, finger, and tolerate exposure to "extreme heat and humidity," pulmonary irritants,

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these
relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can
also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling
of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr.
29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

or hazardous conditions, "occasionally" crawl and climb ramps and stairs, and never climb

ladders, ropes, or scaffolds. R. 26. Additionally, "due to side effects of treatment [she] would

have been off task 20 percent of the time." *Id.*; *see* R. 27–30. The limitation to "light work" ruled

out Connie returning to her past work cleaning private homes, R. 30, 64, but did not necessarily

preclude her from transitioning to other, less physically demanding work, *see* R. 31, 64–65.

Based on the VE's testimony, however, ALJ Munday concluded that Connie was disabled

between December 10, 2014, and March 28, 2016, because being off task 20 percent of the time

would preclude all competitive work, R. 65. *See* R. 31.

After March 28, 2016, the nature of Connie's medical impairments remained the same,

but she experienced "medical improvement" and increased capacity to work with her hands and

stay on task on a regular and continuing basis. *See* R. 31–33. ALJ Munday determined that

Connie was still limited to "light work" with some limitations on postural activities and at most

"frequent" exposure to hazardous workplace conditions, extreme heat and humidity, and

pulmonary irritants like fumes, odors, dust, and gas. R. 33. Based on this RFC finding and the

VE's testimony, ALJ Munday concluded that Connie was not disabled after March 28, 2016,

because she could perform certain light, unskilled occupations (dining room attendant, stock

checker, officer cleaner) that offered a significant number of jobs in the national economy. R. 36;

*see* R. 64–65.

Connie then asked the Appeals Council to review ALJ Munday's decision. R. 13, 222.

The Appeals Council denied her request, R. 1–3, thereby making ALJ Munday's written decision

"the final decision of the Commissioner" partially denying Connie's claims, R. 1. This appeal

followed.

## III. Discussion

6

Connie challenges ALJ Munday's determination that she was not disabled between March 29, 2016, and November 1, 2017. *See* Pl.'s Br. 1, 4, 7–9, ECF No. 14. First, she asserts that the ALJ "erred by failing to determine whether [her] cirrhosis, COPD, [GERD], anxiety, and depression were severe in combination," regardless of whether each impairment was "nonsevere" when considered individually. *Id.* at 5 (emphasis omitted). She also asserts that ALJ Munday's post-March 28, 2016 RFC finding did not accommodate these impairments and their related symptoms. *See id.* at 7. Second, Connie argues ALJ Munday erred in discounting medical opinions from her treating physician Cecilia MacCallum, M.D., and consultative examiner Ankur Fadia, M.D., particularly as they related to Connie's "severely limited" ability to lift and carry much weight. *Id.* at 4; *see id.* at 8–9. Finally, she objects to ALJ Munday's determination that Connie's impairment-related symptoms and exertional limitations were not as continuous or severe as Connie alleged. *See id.* at 7–9. Her arguments are not persuasive.

A.     *Summary*

Connie does not challenge ALJ Munday's conclusion that she was disabled between December 10, 2014, and March 28, 2016. *See* Pl.'s Br. 1. Thus, although the "period at issue" here is from March 29, 2016, through November 1, 2017, *id.*, some background information is necessary to understand how ALJ Munday determined Connie could perform "light work" with some postural and environmental limitations throughout the relevant time and why she found that as of March 29, 2016, Connie experienced "medical improvement" related to her ability to work on a regular and continuing basis. *See* R. 23–29, 31–35.

1.     *Treatment Notes*

Connie has a history of colon cancer, hepatosplenomegaly ("HSM"), diabetes, back pain, cirrhosis, COPD, GERD, anxiety disorder, and depressive symptoms. In November 2014, she

7

was admitted to the hospital for colonic ulceration and HSM. *See* R. 466. Connie reported

constant pain in her right lower quadrant and having bowel movements once or twice a day, but

she had no other complaints. R. 411–13. An abdominal computed tomography ("CT") scan and

colonoscopy showed an ulcerated lesion in her splenic flexure, polyps, HSM with cirrhotic liver

changes, and portal hypertension. R. 427, 429. A repeat CT scan and colonoscopy in December

confirmed the findings. R. 364–65, 408. In December, an esophagogastroduodenoscopy

("EGD") revealed "moderately severe" hypertensive portal gastropathy and "severe" gastritis. R.

410. Later that month Connie treated with Dr. MacCallum, who noted that she had

thrombocytopenia "likely chronic to her HSM" and was a "high risk for surgery." R. 444. Connie

also sought treatment with Sureshi Jayatilaka, M.D., her gastroenterologist. She reported

abdominal pain and weight loss, but denied fatigue, nausea, vomiting, back pain, and changes in

bowel movements. R. 466, 468.

On December 29, Connie was admitted to the hospital for an extended right

hemicolectomy. R. 367. She underwent surgery and a biopsy with no complications. R. 509.

Biopsies of her colon revealed adenocarcinoma and no lymph node involvement. R. 384, 496;

*see also* R. 370. The biopsy of her liver revealed moderate chronic inflammation and mild ductal

proliferation. R. 404. Connie was discharged on January 6, 2015, with prescriptions for Lasix

and Oxycodone and was "advised to avoid heavy lifting and straining." R. 370. At a follow-up

visit with Dr. MacCallum later that month, Connie was very distressed about her back pain and

cancer diagnosis, but she declined to speak with a social worker. R. 432. Dr. MacCallum

diagnosed Connie with Stage IIA tumor and noted that she was "capable of all self-care, [but she

was] unable to perform any work activities." R. 434, 436. Dr. MacCallum took over care for

Connie's back pain from her primary care physician, Frank Adjei, M.D., and prescribed Lortab. R. 434.

In March 2015, Dr. MacCallum recommended chemotherapy because Connie's Stage II colon cancer showed a "significant genetic predisposition." R. 588. Connie reported that her pain was "well controlled," and she denied fatigue, shortness of breath, nausea, vomiting, and changes in bowel habits. R. 589–90. Later that month, Dr. MacCallum noted that a Prednisone taper did not improve Connie's platelet count, and she reduced Connie's chemotherapy dose. R. 580–81. Dr. MacCallum also referred Connie to rheumatology because her antinuclear antibody was positive.[4] R. 581. She noted that Connie could not perform "physically strenuous activity, but [she was] ambulatory and able to carry out light or sedentary work." R. 583.

In May 2015, Dr. MacCallum prescribed 5-FU and Leucovorin for Connie's chemotherapy treatment. R. 672. Connie had no complaints before starting that treatment. R. 672–74. Connie's physical and mental examinations were normal except for some sparse wheezes and crackles in her lungs. R. 674–75. Later in May, Connie complained of joint pain and tingling in her hands, and Dr. MacCallum continued her pain medication. R. 663–65.

Connie received chemotherapy between May and December. *See* R. 573, 1037. During her first cycle of treatment, Connie developed grade I peripheral neuropathy in her fingertips, but it did not interfere with her activities of daily living. R. 573. Connie continued to experience neuropathy in her fingers throughout her chemotherapy treatment. R. 573, 660, 665, 702, 710, 751, 758, 767, 770, 852, 854, 857, 869, 873, 875, 918, 927. The neuropathy worsened in October and November. *See* R. 852, 857, 869. Connie also consistently complained of fatigue, nausea, vomiting, abdominal pain, and back pain. R. 658, 660, 663, 718, 705, 710, 723, 725, 750–51,

---

[4] Despite Dr. MacCallum's referral, the record does not indicate that Connie saw a rheumatologist. *See* R. 705, 761, 766, 869, 876, 898 (noting that Connie was still waiting to see a rheumatologist).

9

757, 762, 767, 850, 852, 854, 857, 866, 871, 873, 883, 886, 888–89, 905, 909, 918, 925, 934, 950, 967, 1039. Medications helped her nausea and pain. R. 705, 755, 761, 848, 852, 860, 909; *see also* R. 876, 898 (noting she took her pain medication intermittently). She regularly denied shortness of breath, change in bowel habits, or problems with urination. R. 582, 660, 665, 706–07, 720, 723, 750, 755, 785, 850, 854, 862, 871, 878, 882–84, 892, 900. Connie's physical and mental examinations were normal except for occasional sparse wheezes and crackles in her lungs, abdominal tenderness, HSM (enlarged liver and spleen), and grade I/borderline grade II neuropathy in her hands. R. 583, 661, 666, 674–75, 680–81, 707–08, 720, 726, 751, 758, 768, 786, 850–51, 862–63, 871–72, 878–79, 893, 900–01, 1041. Dr. MacCallum and Selena Blankenship, NP, routinely noted that Connie could not do "physically strenuous activity, but [she was] ambulatory and able to carry out light or sedentary work." R. 583, 762, 767–68, 850, 876, 884.

After Connie's chemotherapy finished in December 2015, her restaging CT showed no evidence of cancer recurrence. R. 1024. A repeat EGD showed no varices, but "mild" portal hypertension gastropathy. R. 1043. Dr. Jayatilaka noted that Connie had chronic nausea and possible bile gastritis and prescribed a trial of Carafate. R. 1046. CT scans in June and December 2016 showed "[s]table postsurgical changes of the right hemicolectomy with no evidence of local recurrence or metastatic disease," but it also showed "[c]irrhosis with massive splenomegaly," which was "stable." R. 1014–15, 1030–31; *see* R. 1024–25. Connie's December EGD revealed gastric bile, "moderately severe" portal gastropathy, and "mild" stricture, so Dr. Jayatilaka performed a dilation. R. 1016. A chest CT in January 2017 showed HSM and mediastinal lymphadenopathy more prominent than Connie's previous CT in December 2015,

but there was no evidence of underlying lung malignancy. R. 1019. At Connie's colonoscopy in March, a single polyp was removed. R. 1082.

During follow-up visits with her doctors after finishing chemotherapy, Connie consistently reported feeling well and having a good appetite. R. 1043, 1049, 1056, 1066 1071, 1077. She continued to report regular bowel movements or no changes in her bowel habits, and she did not report any frequent urination complaints or neuropathy to her providers. *See* R. 1021, 1026–27, 1047–50, 1054–57, 1061, 1061–66, 1071–73, 1077–79. She also consistently denied shortness of breath. R. 1021, 1027, 1044, 1050, 1057, 1062, 1066, 1073, 1079. Connie continued to report nausea and vomiting, R. 1027, 1043, 1047, 1054, 1064, 1071, 1077, but noted that they were "episodic," had improved since her chemotherapy ended, and responded to medications, R. 1056, 1066, 1071, 1077. Connie also denied fatigue, R. 1021, 1044, 1050, 1062, 1073, 1079, except for one instance in January 2017, R. 1027. In December 2016, she reported occasional dysphagia, R. 1061, but that improved after her dilation procedure, *see* R. 1021, 1066. Her weight fluctuated from edema, which was controlled by medications. R. 1049, 1056, 1066, 1071, 1077. Connie's mental and physical examinations were normal except for HSM. R. 1028, 1044–45, 1051, 1058, 1068, 1073, 1080.

In May 2016, Dr. MacCallum completed a "Post Cancer Treatment" medical source statement. R. 1010–13. She opined that Connie had an "excellent" prognosis and would "likely recover with time as she [got] out from chemotherapy," but still experienced muscle pain, anxiety, fatigue, and impaired concentration and attention "as a result of cancer or treatment." R. 1010, 1013. She could walk one city block before needing to rest, sit for forty-five to sixty minutes at a time and two hours total, and stand for twenty minutes at a time and fewer than two hours total. R. 1012. Dr. MacCallum opined that Connie would need to switch positions at will

11

and take three to four unscheduled breaks lasting ten minutes each, but she did not identify

which "symptoms cause [the] need for breaks." R. 1011–12. Connie could occasionally lift and

carry fewer than ten pounds, rarely lift and carry ten pounds, and never lift any greater weight. R.

1011. She could grasp objects with both hands, use her fingers for fine manipulation, and reach

in front of her body sixty percent of an eight-hour workday, and reach overhead fifty percent of

the workday. *Id.* She would be off task for twenty percent of a typical workday and would miss

about four days per month. R. 1011, 1013.

In May and July 2017, Dr. MacCallum and Whitney Myers, FNP, wrote letters on

Connie's behalf. R. 1088, 1089. Dr. MacCallum wrote that Connie had completed treatment for

her Stage II colon cancer, but still experienced symptoms including "increased frequency" and a

"decreased ability to hold her urine" requiring her to use the restroom approximately every

ninety minutes, or eight to ten times per day. R. 1088. FNP Myers wrote that Connie experienced

"frequent and uncontrollable urges to have a bowel movement" and "[h]er bathroom breaks

should not be limited." R. 1089.

    2.    *DDS Medical Opinions and Consultative Examination*

In September 2015, Ankur Fadia, M.D., conducted a consultative examination of Connie.

R. 800–04. Connie reported that she would complete chemotherapy that December. R. 800. She

denied shortness of breath, frequent urination, and difficulty with activities of daily living, but

reported anxiety and extraordinary fatigue from the chemotherapy. R. 801–02. Dr. Fadia noted

that Connie had a "[r]elatively benign physical exam" with normal range of motion,

coordination, station, gait, strength, reflexes, and sensation. R. 802–03. He did note, however,

that her colon cancer "likely preclude[d Connie] from gainful employment at least in the near

future" because she reported "consistent fatigue and nausea which is typical in a chemotherapy

regimen." R. 803; *see* R. 804. During the time Connie received chemotherapy, her ability to

stand and walk in an eight-hour workday likely would be "limited to 2 hours and frequently

less." R. 804. Connie had no limitations in her abilities to sit during an eight-hour workday,

reach, handle, finger, grasp, and feel. *Id.* Based on his findings on that day's physical exam, Dr.

Fadia opined that Connie could "carry . . . 20 pounds occasionally and 10 pounds frequently

secondary to poor conditioning." *Id.* But, Dr. Fadia also opined based on these findings that

Connie could only "lift . . . 10 pounds occasionally and [fewer] than 10 pounds secondary to

poor conditioning." *Id.* Poor conditioning would also limit her ability to perform most postural

activities on a more than "frequent" basis. *Id.*

      On initial review for the state agency, in October 2015, Joseph Leizer, Ph.D., noted that

Connie had been diagnosed with anxiety, but her mental examinations were relatively normal

and her anxiety was controlled by medication. R. 82–83, 98–99. She had no restrictions in

activities of daily living; no difficulties maintaining social functioning; no difficulties

maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. *Id.*

Robert McGuffin, M.D., opined that Connie could occasionally lift or carry twenty pounds,

frequently lift or carry ten pounds, and walk, stand, or sit for six hours during an eight-hour day.

R. 84, 100. She could frequently balance, stoop, kneel, and crouch, and occasionally climb ramps

or stairs, but never climb ladders, ropes, or scaffolds. R. 85, 101. Connie should avoid

concentrated exposure to extreme heat, humidity, pulmonary irritants, and hazards. R. 85–86,

101–02. Dr. McGuffin attributed these postural and environmental limitations to Connie's

COPD, obesity, and chemotherapy for colon cancer. R. 84, 85, 100, 101. In December, Dr.

Leizer affirmed his opinion about Connie's mental capacities. R. 115–16, 131–32. Brian Strain,

M.D., affirmed Dr. McGuffin's opinion about Connie's physical limitations. R. 117–19, 133–35.

3.    *Connie's Statements*

In February 2015, Connie submitted a Pain Questionnaire along with her application. R. 266–68. She experienced an aching, stabbing, and burning pain that occurred all day in her stomach, back, and right side. R. 267. Standing and walking made her pain worse. *Id.* Her medications did not cause any side effects, and they helped her pain "some but not a lot." R. 268. In a November Disability Report, Connie reported that she had nausea daily and no feeling in her fingertips. R. 292.

In July 2017, Connie testified that she went to the bathroom at least ten times per day because of residual side effects from chemotherapy. R. 55, 59–60. She sometimes had urinary accidents from sneezing or coughing, and she coughed a lot because she often lost her breath. R. 59. She had more bad days than good days and could not do "too much of anything" on bad days. R. 57. She did not drive because her medications made her sleepy. *Id.* She had regular follow up EGDs, CT scans, colonoscopies, and blood work. R. 56–57. At her most recent colonoscopy, she had a cancerous polyp removed. R. 56. She took medication for diabetes, pain, and nerves, R. 55, and did not have concerns about the medications with her liver conditions, R. 57–58. She had an enlarged spleen and had to be careful lifting things and moving so it would not burst. R. 56. She could not lift "anything," and she could stand for only ten minutes before needing to sit down. R. 58. She could not walk half a city block because she felt tired, weak, and short of breath. *Id.* She had recently been treated in the emergency room for shortness of breath. *Id.* She had COPD and asthma, but she could not afford the medications. R. 56. Her anxiety and depression had not gotten better, and she had pain and crying spells. R. 60.

B.    *The ALJ's Decision*

ALJ Munday concluded that Connie was disabled between December 10, 2014, and

March 28, 2016. R. 20. At step two, ALJ Munday found that Connie "had the following severe

impairments: malignant neoplasm of the colon, obesity, spine disorder, dysfunction of a major

joint (neuropathy), and diabetes mellitus." R. 23. Her other impairments were non-severe

because they did not "cause more than minimal limitations in [Connie's] ability to perform basic

work activities" for a continuous twelve months. R. 24. Her anxiety was controlled by

medication, and there were no "treatment notes in the record demonstrating any abnormalities."

R. 25. Accordingly, the ALJ found that Connie had no limitations in the four areas of mental

functioning.[5] *Id.* Her severe impairments did not meet or equal any relevant Listing. *Id.*

Turning to the RFC assessment, ALJ Munday briefly summarized Connie's disability

reports and testimony. R. 26–27. She found that Connie's "medically determinable impairments

could reasonably be expected to produce [her] alleged symptoms" and her "statements

concerning the intensity, persistence and limiting effects of these symptoms [were] generally

consistent with the evidence from December 10, 2014 through March 28, 2016." R. 27–28.

Connie's "symptoms and limitations" were "consistent and persuasive" during that period

because she "sought and received appropriate medical treatment" and there were "no

inconsistencies in the record that would bring the consistency of [her] statements into serious

question." R. 30. ALJ Munday gave "partial" weight to Dr. Fadia's opinion because the side

effects of chemotherapy were "consistent with the record as a whole," but his limitations on

standing, walking, and lifting were "not supported by findings on physical examinations which

were largely unremarkable." R. 29. ALJ Munday gave "partial" weight to the DDS psychological

---

[5] The four areas of mental functioning are: (1) understand, remember, or apply information; (2) interact
with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. pt. 404,
subpt. P. app. 1 § 12.00(2)(b).

consultant, Dr. Leizer because "the evidence as a whole supports no limitations in the current

areas of mental functioning." *Id.* She gave "partial" weight to the DDS physicians' opinions

because they "had an opportunity to review some of the evidence of record," but Connie

"experienced peripheral neuropathy, joint pain, nausea, vomiting, and fatigue" while undergoing

chemotherapy and "required time of[f] task." *Id.* Finally, ALJ Munday gave "little" weight to Dr.

MacCallum's and NP Hinson's opinions that Connie was capable of self-care and light or

sedentary work because they were "vague and [did] not provide any specific functional

limitations" or "consider [Connie's] side effects from chemotherapy." R. 30.

ALJ Munday found that, between December 10, 2014, and March 28, 2016, Connie

retained the RFC to perform "light" work with additional limitations:

> [S]he could frequently balance, stoop, kneel, and crouch; could occasionally crawl
> and climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could
> frequently finger; could have frequent exposure to extreme heat and humidity;
> could have frequent exposure to pulmonary irritants including fumes, odors, dust,
> and gas; could have frequent exposure to hazardous conditions, including
> unprotected heights and moving machinery; and due to side effects of treatment
> would have been off task 20 percent of the time.

R. 26. Based on this RFC and the VE's testimony, ALJ Munday concluded at step four that

Connie could not return to her past relevant work, R. 30, 64–65, and at step five that Connie was

unable to adjust to other work during the closed period, R. 30–31, 64–65.

ALJ Munday found that "[m]edical improvement occurred" on March 29, 2016, and it

was related to Connie's "ability to work because there [had] been an increase in [her] residual

functional capacity." R. 32–33 (citing 20 C.F.R. §§ 404.1594(b)(1), 404.1594(b)(4)(i),

416.994(b)(1)(i), 416.994(b)(1)(iv)(A)). From March 29, 2016 onward, Connie retained the RFC

to perform "light" work with the same nonexertional restrictions except the need to be off-task

for twenty percent of the time and limitations on using her fingers for fine manipulation.

16

*Compare* R. 26, *with* R. 33. Connie's "medically determinable impairments could reasonably be expected to produce [her] alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of [those] symptoms" were "inconsistent with the medical evidence of record demonstrat[ing] limited complaints or abnormalities after March 28, 2016." *Id.* ALJ Munday summarized Connie's treatment notes and test results after March 28, 2016. R. 33–34. Connie's "complaints of ongoing symptoms, such as urinary and bowel urgency and frequency [were] not supported by the longitudinal treatment notes," she "reported improvement in her symptoms after March 28, 2016," and she did not complain of neuropathy. R. 34.

ALJ Munday gave "partial" weight to NP Hinson's opinion that Connie could carry out light or sedentary work because the opinion was "somewhat vague, as it [did] not provide any specific functional limitations," but it was "generally consistent with the record as a whole, which support[ed] a light work level." *Id.* She gave "little" weight to Dr. MacCallum's medical source statement, R. 1010–13, because it was "not consistent with the evidence as a whole, which demonstrate[d] improvement after completing chemotherapy," R. 34–35. Finally, ALJ Munday gave "little" weight to Dr. MacCallum's and NP Myers's opinions regarding the number of bathroom breaks Connie required, R. 1088–89, because they were "not supported by the longitudinal treatment notes." R. 35. Based on the VE's testimony, ALJ Munday found that Connie could not perform any past relevant work. R. 35, 64. She found, however, that Connie was capable of adjusting to other less demanding occupations (dining room attendant, stock checker, office cleaner) that offered a significant number of jobs in the national economy. R. 36, 64–65.

C.    *Analysis*

    1.    *Combination of Non-Severe Impairments*

Connie first asserts that ALJ Munday "erred by failing to determine whether [her] cirrhosis, COPD, [GERD], anxiety, and depression were severe in combination," regardless of whether each impairment was "nonsevere" when considered individually. Pl.'s Br. 5 (emphasis omitted). "At step two, the ALJ determines whether the claimant as a 'severe medically determinable physical or mental impairment . . . or combination or impairments.'" *Musser v. Berryhill*, No. 5:16cv17, 2017 WL 4399202, at *3 (W.D. Va. Sept. 29, 2017) (quoting 20 C.F.R. § 404.1520(a)(4)(ii)). "The severity regulation requires the claimant to show that [s]he has an 'impairment or combination of impairments [that] significantly limits' 'the abilities and aptitudes necessary to do most jobs.'" *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (quoting 20 C.F.R. §§ 404.1520(c), 404.1521b) (1986)). Thus, an ALJ may find a medical impairment(s) to be "not severe" when she logically explains why it is a "slight abnormality" (or combination of slight abnormalities) that has such a minimal effect on the claimant that it does not meaningfully disrupt her ability to do basic work activities. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984); SSR 96-3p, 1996 WL 374181, at *1–2 (July 2, 1996).

Contrary to Connie's argument, Pl.'s Br. 5–6, ALJ Munday recognized she was required to determine whether any of Connie's impairments were severe in "combination," R. 21 (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)), and she did consider all of Connie's medical conditions at step two, R. 23–25. *Cf. Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) ("[T]he ALJ . . . stated that the whole record was considered, and absent evidence to the contrary, we take her at her word."); *Fouch v. Colvin*, No. 2:12cv659, 2013 WL 1221909, at *6 (S.D. W. Va. Mar. 25, 2013) (ALJ's citation to governing regulation left "no doubt that the ALJ was mindful of the correct legal standards in reaching his decision"). She summarized Connie's test results for X-rays, CT scans, EGDs, and an ultrasound that diagnosed and revealed the "severity" of

18

Connie's non-severe physical impairments, as that term is defined in the regulations. R. 24
(citing 397, 410, 1014–16, 1023, 1030–31, 1047–48, 1064, 1082, 1085). ALJ Munday then
determined that there was "no evidence in the record that these impairments cause[d] more than
minimal limitations in [Connie's] ability to perform basic work activities." *Id.* Connie does not
point to any functionally limiting effects of those impairments, and no treatment note in the
record suggests their symptoms combined to "significantly" limit her functional abilities. Connie
merely identified her diagnoses of those conditions, noting that doctors described some of them
as "severe" or otherwise significant. Pl.'s Br. 5–6 (reciting medical findings of "severe gastritis,"
"moderately severe portal gastropathy," and "cirrhosis with 'massive splenomegaly'"). She does
not suggest the doctors were "employing the conventional definitions of these terms as used in
the Social Security context." *Klaus v. Astrue*, No. 2:11cv86, 2012 WL 2921372, at *7 (E.D. Cal.
July 17, 2012) ("ALJs have been cautioned not to assume that medical sources using regulatory
terms of art are aware of the regulatory definitions or conventional [legal] understanding of those
terms." (citing SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996)). "[M]edical conditions alone
do not entitle a claimant to disability benefits; '[t]here must be a showing of related functional
loss.'" *Felton-Miller v. Astrue*, 459 F. App'x 226, 229–30 (4th Cir. 2011) (quoting *Gross v.
Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986)). A review of the record does not support Connie's
assertion that her non-severe impairments imposed more than minimal, if any, functional
limitations.

The ALJ also considered Connie's anxiety and her allegation of depression. She found
that Connie had no limitations in the four areas of mental functioning because her anxiety was
controlled by medication and there were "no mental health treatment notes in the record
demonstrating any abnormalities in" the areas of mental functioning. R. 25. This assessment is

accurate as Connie routinely had normal mental status examinations. *See, e.g.*, R. 583, 680–81,

720, 751, 871–72, 878–72, 1028, 1044–45, 1051, 1058, 1068, 1073; *Alla Z. v. Berryhill*, No.

5:17cv61, 2018 WL 4704060, at *3–4 (W.D. Va. Sept. 30, 2018) (substantial evidence supported

conclusion that claimant's anxiety and depression were nonsevere where ALJ cited limited

abnormalities on mental-status exams and lack of mental-health treatment beyond medications

prescribed by general practitioner). Regarding Connie's alleged depression, ALJ Munday noted

that she had not been diagnosed with depression and, therefore, ALJ Munday could not consider

"this alleged condition to be a medically determinable impairment." R. 25 (citing 20 C.F.R. §§

404.1508, 416.908 (2016)); *see* 20 C.F.R. §§ 404.1521, 416.921 (2017). The regulations require

that "a physical or mental impairment must be established by objective medical evidence from an

acceptable medical source" and the Commissioner will not use an individual's subjective report

of his or her "symptoms, a diagnosis, or a medical opinion to establish the existence of an

impairment(s)." 20 C.F.R. §§ 404.1521, 416.921. The record does not show Connie was

diagnosed with depression, and ALJ Munday was not allowed to find that Connie suffered from

depression based on her testimony alone.

Connie does not "point to any specific piece of evidence not considered by the [ALJ] that

might have changed the outcome of" the ALJ's assessment of these conditions. *Reid*, 769 F.3d at

865 (emphasis omitted). Instead, she urges the Court to reweigh the same medical exhibits that

ALJ Munday considered, R. 23–25, and to conclude that the ALJ should have found her disabled

by a combination of her severe and non-severe medical impairments. The Court's role here is "to

determine whether the ALJ's decision is supported as a matter of fact and law." *Keene v.*

*Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). It "cannot simply look at the same evidence

and reverse the ALJ on the basis that it could have reached a different result." *Carr v. Berryhill*,

No. 6:16cv10, 2017 WL 4127662, at *5 (W.D. Va. Sept. 18, 2017). Because the ALJ cited

relevant evidence and explained her step two assessment I find that substantial evidence supports

ALJ Munday's her determination that the non-severe impairments did not cause more than

minimal limitations in Connie's ability to work.

> 2. *RFC Assessment: Combined Limiting Effects*

Connie also argues that ALJ Munday failed to consider her severe and non-severe

impairments in combination when crafting her RFC. Pl.'s Br. 7. A claimant's RFC is her

"maximum remaining ability to do sustained work activities in an ordinary work setting" for

eight hours a day, five days a week despite all her medical impairments and symptoms.[6] SSR 96-

8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by

the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller*, 459 F. App'x at

230–31, and it should reflect specific, credibly established "restrictions caused by medical

impairments and their related symptoms," including pain, that affect the claimant's "capacity to

do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See*

*Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL

658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17,

2016). The ALJ has broad (but not unbounded) discretion to decide whether an alleged symptom

or limitation is supported by or consistent with other relevant evidence, including objective

evidence of the underlying medical impairment, in the claimant's record. *See Perry v. Colvin*,

No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v.*

*Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the ALJ's

---

[6] "Symptoms" are the claimant's own description of her medical impairment. 20 C.F.R. §§ 404.1528(a),
416.928(a).

RFC findings when it is clear that she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and she built an "accurate and logical bridge from that evidence to h[er] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quotation marks and brackets omitted). *See Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019); *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 662 (4th Cir. 2017). ALJ Munday's decision meets this deferential standard.

Contrary to Connie's argument, Pl.'s Br. 7, ALJ Munday discussed the medical evidence of Connie's non-severe impairments during both the closed period of disability and after Connie experienced medical improvement, R. 26 (citing R. 397, 410, 1014–16, 1023, 1030–31, 1047–48, 1064, 1082, 1085). ALJ Munday concluded that Connie's COPD, GERD, cirrhosis, anxiety, and several other medical impairments were non-severe. *Id.* She then found that Connie did not develop any new impairments after March 29, 2016, and that the severity of her existing impairments remained the same. R. 31. ALJ Munday determined that Connie could perform a limited range of light work that did not require (among other things) more than "frequent exposure to extreme heat and humidity" or to "pulmonary irritants" like fumes, odors, dust and gas. R. 33; *see* R. 26, 29, 85–86, 118–19. The RFC did not incorporate limitations related to Connie's cirrhosis or GERD because there was "no evidence in the record that these additional impairments cause[d] significant limitations in [Connie's] ability to perform basic work activities for a continuous period of at least 12 months." R. 24. It also did not incorporate limitations related to Connie's anxiety or alleged depression because she had no limitations in the four areas of mental functioning and she was not diagnosed with depression. R. 25; *see Cynthia W. v. Saul*, No. 5:18cv102, 2020 WL 2090677, at *5 (W.D. Va. Apr. 30, 2020) (affirming RFC finding that did not include any mental limitations where the ALJ "adequately explained" at step two why the

claimant's non-severe "depression and anxiety caused 'mild' limitations in her mental
functioning overall, but did not actually impair her capacities to sustain more specific work-
related mental functions under ordinary workplace conditions").

ALJ Munday's discussion of the evidence is sufficient to show that she "considered" the
combined limiting effects of Connie's impairments. *See Reid*, 769 F.3d at 865. Again, Connie
does not "point to any specific evidence not considered by the [ALJ] that might have changed the
outcome of" the ALJ's assessment of these conditions. *Id.* (emphasis omitted). Additionally,
Connie did not identify what specific limitations resulting from these non-severe conditions the
ALJ should have incorporated in the RFC. *See McAnally v. Astrue*, 241 F. App'x 515, 518 (10th
Cir. 2007); *Lowery v. Comm'r of Soc. Sec.*, No. 4:10cv47, 2011 WL 2648470, at *4 (W.D. Va.
June 29, 2011). A review of the record does not reveal any treatment note that identifies limiting
effects of these impairments singly or in combination. Accordingly, I find that the ALJ's
determination that these impairments did not cause more than minimal effect is supported by
substantial evidence.

    3.    *Medical Opinions*

Connie argues that the ALJ erred in discounting Dr. MacCallum's and Dr. Fadia's
medical opinions. Pl.'s Br. 4, 8–9. "Medical opinions" are statements from "acceptable medical
sources," such as physicians, that reflect the source's judgments about the nature and severity of
the claimant's impairment, including her symptoms, prognosis, functional limitations, and
remaining abilities. 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). The ALJ must adequately
explain the weight afforded to every medical opinion in the record, taking into account factors
such as the nature and extent of the source's treatment relationship with the claimant; how well
the source explained or supported the opinion; the opinion's consistency with the record as a

whole; and whether the opinion pertains to the source's area of specialty. *Id.* §§ 404.1527(c), 416.927(c). Medical opinions from treating and examining physicians typically deserve more weight than those from non-examining physicians, such as the DDS medical reviewers. *Brown*, 873 F.3d at 268; 20 C.F.R. §§ 404.1527(c), 416.927(c). Courts "must defer to the ALJ's assignments of weight" to differing medical opinions "unless they are not supported by substantial evidence," *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015), or they were reached by means of an improper standard or misapplication of the law, *see Coffman*, 829 F.2d at 517.

Connie argues that ALJ Munday improperly discounted Dr. MacCallum's medical source statement. Pl.'s Br. 4; *see* R. 1010–13. In May 2016, five months after Connie completed chemotherapy, Dr. MacCallum opined that Connie experienced muscle pain, anxiety, fatigue, nausea, and impaired concentration and attention "as a result of cancer or treatment." R. 1010–11. Connie could walk one city block, sit for forty-five to sixty minutes, stand for twenty minutes, and work only ten hours per week. R. 1012. She could occasionally lift or carry fewer than ten pounds, rarely lift or carry ten pounds, and never lift any greater weight. R. 1011. She could grasp objects with both hands, use her fingers for fine manipulation, and reach in front of her body sixty percent of an eight-hour workday, and reach overhead fifty percent of the workday. *Id.* Connie would be off task for twenty percent of a typical workday. *Id.*

ALJ Munday gave "little" weight to Dr. MacCallum's opinion because it was "not consistent with the evidence as a whole, which demonstrate[d] improvement after completing chemotherapy." R. 34–36. Substantial evidence supports ALJ Munday's determination to discount Dr. MacCallum's opinion. In finding that Connie was disabled between December 10, 2014 and March 28, 2016, ALJ Munday determined that the side effects of chemotherapy would

cause Connie to be off task twenty percent of the time and would limit her to frequent fingering. *See* R. 28 ("While undergoing chemotherapy, [Connie] experienced peripheral neuropathy, joint pain, nausea, vomiting, and fatigue [and] required time off task due to side effects of treatment."). ALJ Munday reasoned that because those symptoms subsided after chemotherapy, Connie no longer had those functional limitations. R. 32–33. The record shows that Connie did experience improvement in her nausea and fatigue after she completed chemotherapy. *See* R. 1021, 1044, 1050, 1062, 1073, 1079 (denying fatigue); R. 1021, 1061–62, 1073, 1079 (denying nausea and/or vomiting); R. 1055, 1066, 1071, 1077 (reporting her nausea had improved and medication helped). Connie also had no complaints of neuropathy after she completed chemotherapy. *See* R. 1016–87. Therefore, substantial evidence supports the ALJ's determination that Dr. MacCallum's opinion was not consistent with the improvement that Connie experienced after completing chemotherapy.

Connie also takes issue with the fact that ALJ Munday rejected Dr. MacCallum's opinion regarding her "severely limited" exertional abilities. Pl.'s Br. 4; *see id.* at 8–9. Considering ALJ Munday's "opinion as a whole, it is clear that [s]he considered the evidence of record and provided sufficient support for her decision." *Thompson v. Colvin*, No. 7:13cv32, 2014 WL 4792956, *3 (W.D. Va. Sept. 25, 2014). In her discussion of Dr. Fadia's opinion, R. 28–29, ALJ Munday determined that his similar opinions of Connie's limitations in standing, walking, and lifting were "not supported by findings on physical examinations which were largely unremarkable," R. 29. Dr. Fadia had opined that these limitations were a result of Connie's "poor conditioning," and Connie argues that there was no improvement in her "conditioning," only in the chemotherapy side effects. Pl.'s Br. 9. The record amply supports ALJ Munday's determination that the relevant portion of Connie's physical exams were largely unremarkable.

Connie routinely had normal physical examinations except for occasional signs of sparse wheezes or crackles in her lungs, abdominal tenderness, and HSM. *See* R. 583, 661, 666, 674–75, 680–81, 707–08, 720, 726, 751, 758, 768, 786, 850–51, 862–63, 871–72, 877–78, 893, 900–01, 1028, 1041, 1044–45, 1051, 1058, 1063, 1068, 1073, 1080. Considering this evidence, the ALJ reasonably could find that Dr. MacCallum's and Dr. Fadia's opinions of Connie's extremely limited capacity to stand, walk, or lift were not supported by the record. Despite Connie's argument that "the Court should place emphasis on the fact that Dr. Fadia" found Connie was limited because of poor conditioning, it is for the ALJ, not the Court to weigh such conflicting evidence. *See Carr*, 2017 WL 4127662, at *5. Connie does not "point to any specific piece of evidence not considered by the [ALJ] that might have changed the outcome of [her] disability claim." *Reid*, 769 F.3d at 865 (emphasis omitted). The weight ALJ Munday gave to the opinions of Dr. MacCallum and Dr. Fadia is supported by substantial evidence.

> 4.    *Credibility Analysis*

Lastly, Connie argues that ALJ Munday erred in discounting her statements about her symptoms and their limiting effects. Pl.'s Br. 7. The regulations set out a two-step process for ALJs to evaluate symptoms as part of the RFC assessment. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *id.*, to work on a regular and continuing basis, *see Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016). "The second determination requires the ALJ to assess the credibility of [subjective] statements about symptoms and their

functional effects," *Lewis*, 858 F.3d at 866, based on all the relevant evidence in the record. 20

C.F.R. §§ 404.1524a, 404.1526a, 404.1529(c), 416.924a, 416.926a, 416.929(c).

The ALJ cannot reject the claimant's statements about the intensity, persistence, or

functional effects of her "pain or other symptoms . . . solely because the available objective

medical evidence does not substantiate [those] statements." 20 C.F.R. §§ 404.929(c)(2),

416.929(c)(2). The ALJ must give specific, legally adequate reasons, supported by "references to

the evidence" for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No.

4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013), and, when necessary, she should

"explain how [s]he decided which of [those] statements to believe and which to discredit,"

*Mascio*, 780 F.3d at 640. The court will defer to an ALJ's adverse credibility determination

absent "exceptional circumstances," *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th

Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1009 (4th Cir. 1997)), and so long as her

written decision provides an "accurate and logical bridge from the evidence to [her] conclusion,"

*Brown*, 873 F.3d at 269.

Connie argues that ALJ Munday's credibility determination was "legally insufficient"

because she did not "specifically rebut" Connie's testimony about lifting and standing. Pl.'s Br.

7–8. ALJ Munday determined that Connie's "statements concerning the intensity, persistence

and limiting effects of [] her symptoms [were] inconsistent because the medical evidence of

record demonstrate[d] limited complaints or abnormalities after March 28, 2016." R. 33. She

explained that Connie's "complaints of ongoing symptoms, such as urinary and bowel urgency

and frequency [were] not supported by the longitudinal treatment notes," Connie "reported

improvement in her symptoms after March 28, 2016," and Connie did not complain of

neuropathy after March 28, 2016. R. 34. Substantial evidence supports ALJ Munday's

determination.

After her chemotherapy treatment ended, Connie reported no or improved nausea and

vomiting, R. 1021, 1055, 1061–62, 1066, 1071, 1073, 1077, 1079, and she routinely denied

fatigue, R. 1021, 1044, 1050, 1062, 1073, 1079. The record does not indicate that Connie

reported neuropathy or urinary or bowel urgency and frequency after her chemotherapy

treatment. Additionally, Connie did not report any difficulties with lifting, standing, or walking.

*See Fluellen v. Colvin*, No. 4:14cv30, 2015 WL 2238997, at *4 (W.D. Va. May 12, 2015) (Kiser,

J.) (finding that the claimant's failure to report, or express denial of, relevant symptoms to her

providers created "inconsistencies [that] support[ed] the ALJ's finding that [her] symptoms and

reported functional limitations were not as severe as alleged" (citing *Bishop*, 583 F. App'x at

68)). In fact, ALJ Munday asked Connie at the hearing if she had complained to Dr. MacCallum

about residual side effects from colon cancer and chemotherapy, R. 51, and asked Connie's

attorney to identify any examples after the hearing because she had not found such complaints

during her review of the record, R. 52. The record does not indicate that Connie or her attorney

identified such complaints to ALJ Munday after the hearing, and Connie does not point to any

such evidence in her brief. *See* Pl.'s Br. 8–9.

ALJ Munday adequately explained the rationale behind her RFC determination that

Connie could perform a limited range of light work and her determination that Connie's non-

severe impairments did not result in more than minimal functional limitations. She also gave

legally sufficient reasons for the weight afforded to the medical opinions of record and for

discounting Connie's complaints of disabling symptoms after March 28, 2016. Accordingly, I

find that substantial evidence supports the ALJ's decision to deny benefits outside the closed period.

### IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge, **DENY** Connie's Motion for Summary Judgment, ECF No. 13, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 15, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: May 14, 2020

Joel C. Hoppe
United States Magistrate Judge